J<small>OSEPH</small> G. G<small>IBBONS</small> *et al.*

*v.*

M<small>ARY</small> H<small>OAG</small>.

*Filed at Ottawa May 18, 1880.*

1. M<small>ORTGAGE</small>—*right to sell under power.* A mortgage with a power of sale was given to secure the payment of eighteen promissory notes, each for $2400, two of which were payable on the first day of January in each

year thereafter, all of which were payable unconditionally, and one for $48,000, payable ten years after the first two, which was upon condition that the mortgagee should procure a conveyance to the mortgagor from certain minor heirs, which mortgage provided that if default should be made in the payment of either of the $2400 notes numbered one in red ink, for thirty days, or of either of the other notes for $2400 for ninety days, or of one fourth part of the note for $48,000 for thirty days after maturity, then the whole sum unpaid should become due, and a foreclosure might be had: *Held*, that a sale might be had for a default in the payment of any of the $2400 notes in the time designated, without first tendering the conveyance from the minor heirs, but not as to the last note, without making or tendering the deeds.

2. SAME—*when passes subsequently acquired title.* Where a mortgage uses the words "has granted, bargained, sold and conveyed" to the mortgagee, "his heirs and assigns forever," any subsequent interest the mortgagor may acquire to the mortgaged premises, by a deed to his grantor, which inures to his benefit, will pass by the mortgage or any sale that may be made pursuant to its terms. The subsequent title so acquired by the grantor of the mortgagor will not inure to the person of the latter, but for the benefit of his title, and will pass by the mortgage or any valid sale under it.

3. SAME—*sale under power—purchaser may rely on what record shows of sale.* Where a mortgagee, after a sale made by him under a power in a mortgage, acquires the legal title by a conveyance from the purchaser to him, the mortgage and his deed to the purchaser, which are duly recorded, showing his right to sell, after which he sells and conveys a part of the premises to an innocent purchaser for its full value, who has no notice of any defect in the proceedings under the mortgage, the fact that the mortgagee, after such last conveyance by him, treats the mortgage as not foreclosed by the sale, will not affect his grantee, who has the right to rely upon the record as it was at the time of his purchase.

4. SAME—*sale under power for the benefit of the mortgagee only voidable.* If a sale is made by a mortgagee under a power in a mortgage, not in good faith, but in fact for himself, to whom the purchaser conveys, the sale is not void, but only voidable in equity, and it may be set aside while the title remains in the mortgagee, but not after its transfer to a *bona fide* purchaser.

5. SAME—*laches in taking steps to avoid sale.* Where no steps are taken by a mortgagor, or those claiming under him, for more than five years to set aside a sale under a power in the mortgage, during which time a third person becomes a purchaser in good faith, relying on the validity of the sale, who is suffered from year to year to expend money on the land, in payment of taxes, etc., such *laches* will exclude all inquiry into mere irregularities which would but render the sale voidable, if assailed by the proper parties in apt time before the intervention of the rights of third parties.

6. SAME—*when defective execution of power passes an equitable title.* Where a sale is made under a mortgage in strict accordance with a power therein contained, but the deed is defectively executed by the mortgagee in his own name instead of in the name of the mortgagor as his attorney in fact, as required in the power, the sale will be valid, and pass an equitable title to the purchaser and his assigns, and a court of equity will aid the defective execution of the deed, and establish the legal title to the land.

7. SAME—*recitals in deed made under power, when recorded, are notice.* Where a deed for land sold under a power in a mortgage, reciting correctly all the facts showing a right to make the sale, is recorded in apt time, the record thereof will affect all persons thereafter claiming under the mortgagor with constructive notice that there had been a valid sale under the power, although the deed may be defectively executed so as not to pass the legal title.

8. SPECIFIC PERFORMANCE. Where time is made of the essence of a contract for the sale of land, and no payment has been made on it for a period of twenty-five years, except a portion of the first year's interest in advance, and no tender has been made, a specific performance of the contract will not be decreed, or a rescission of it and a return of the money paid, on account of such inexcusable and long delay.

9. CHANCERY—*laches to defeat equitable relief.* Mere delay alone, short of the period fixed as a bar by the Statute of Limitations, will not preclude the assertion of an equitable right. Where the adverse party is not lulled into security by the delay, or prejudiced thereby, the defence of *laches* can not be considered.

10. ATTORNEY AT LAW—*estoppel to assert claim against client.* It can not be tolerated that an attorney shall advise or encourage a client in investing in a bad title, and he himself afterwards buy up the better title and assert it as against his former client. He will not be allowed to set up his ignorance of the law or his negligence at the time of advising his client, as against the claim of his client acquired on his advice.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Mary Hoag filed her petition, under the "Burnt Records act," on the first of June, 1876, in the circuit court of Cook county, to establish her title to certain real estate in the city of Chicago, hereinafter more particularly described.

She alleges in her petition that on the 18th of November, 1858, Joseph W. Wiltberger was owner of one half, and his children, by descent from his deceased wife, were owners of the other half of the north half of north half of the north-

west quarter, and the west half of the north-east quarter of section 15, township 38, range 14, in Cook county.

The names of the children so inheriting from their deceased mother are: Louisa Ann, William H., Margaret A., Charles S., Joseph S., and Laura Ann. Louisa intermarried with Isaac W. Edwards, and subsequent to the death of her mother, and before the filing of the present petition, died intestate, leaving an infant as her sole heir at law, who shortly thereafter died intestate, leaving its father, the said Isaac W. Edwards, its only heir at law, so that thereafter the said Isaac W. Edwards was entitled to the share which went by descent to the said Louisa Ann. That about November 18, 1858, said Joseph W. Wiltberger, and said William H. Wiltberger, Margaret A. Wiltberger and Isaac Edwards, all of lawful age, conveyed said land to Jesse Embree, by deed of that date, which was duly recorded in the proper office on the next day—(the 19th of November, 1858); that, at the same time, Jesse Embree executed back to said Joseph W. Wiltberger a mortgage (which was also recorded in the proper office on the next day) of the same lands to secure the payment of $91,200, (the purchase money,) evidenced by nineteen promissory notes, given on that day, to said Joseph W. Wiltberger, eighteen of which are for $2400 each, and two are payable on the first of January in each year from January 1, 1859, until January 1, 1867, both inclusive, and the nineteenth note is for the sum of $48,000, payable January 1, 1868; that said notes were set forth and described in said mortgage, which provided that if default should be made in the payment of either note for $2400, numbered one in red ink, for thirty days, or of either other note for $2400, for ninety days, or of one-fourth part of said $48,000 note for thirty days, then the whole sum unpaid should become due, and said mortgage might be foreclosed at the option of said Wiltberger, or, after publishing notice for thirty days, he might sell at auction all right and equity of redemption of Embree, and, as attorney of Embree, make deed in fee simple,

and that such sale should be a perpetual bar of equity of redemption, etc.

It is then alleged that default was made in several of the notes which matured up to and including January 1, 1862, and on May 9, 1862, there was due on said notes, previously matured, about $13,800 of principal, and for such default said Joseph W. Wiltberger advertised said land for sale, under said power, and on the 10th of June, 1862, sold the said north half of north half of the north-west quarter to Egbert W. Wiltberger, for $16,000, and then sold the said west half of the north-east quarter to said Egbert W. Wiltberger for $32,000, and, by deed of that date, recorded September 16, 1862, in pursuance of said mortgage, power of sale and notice, said Joseph W. Wiltberger conveyed, by deed, to said Egbert W. Wiltberger said two tracts of land in fee simple, which deed contained the recitals that default was made, and that the premises were duly advertised and sold to said Egbert W., and that $48,000 was paid to said Joseph; that Egbert W. and wife on the 4th of September, 1862, by deed of that date, which was duly recorded September 17, 1862, conveyed the same tracts of land back to Joseph W. Wiltberger, for the consideration of $48,000, and that at the time of purchasing her five lots these deeds were all on record, and petitioner, in good faith, relied on them.

On October 17, 1857, Yerby's subdivision of said two tracts of land was recorded, and on August 19, 1859, Embree and wife conveyed lots 1, 2, 3, 25, 26 and 27, in block 2 in said subdivision, to Amos F. Tompkins, in which deed said mortgage from Embree to Wiltberger was referred to and stated to be assumed by said Tompkins; that Tompkins, by deed dated January 7, and recorded January 9, 1861, conveyed to Joseph G. Gibbons said lot 2, subject to said mortgage; that on the 15th of November, 1862, Gibbons and wife, by deed of that date, and which was duly recorded December 6, 1862, conveyed said lot 2 and lot 22, in said subdivision, with warranty against his own acts or persons claiming under him, to

the said Joseph W. Wiltberger; that by warranty deed dated January 31 and recorded February 5, 1863, said Joseph W. Wiltberger conveyed to petitioner said lots 2, 3, 25, 26 and 27, in block 2 in said Yerby's subdivision, in consideration of about $900, paid by petitioner to said Wiltberger, which was the full value of said lots, and she purchased in good faith, without notice of the claims of any other person thereto, and paid the entire consideration at the time of such conveyance, and long before she had notice or suspicion that other persons claimed adversely to her, and she believes that by virtue of said conveyance to her and the other matters thereinafter set forth, she acquired good title in fee simple to said lots, both at law and in equity, and she claims to own the same.

The petitioner further alleges that on May 10, 1862, said lots 2 and 3 on the north 134 feet thereof were vacant, and she took possession of said north 134 feet and inclosed the same with a fence on the north, east and west sides; that there was a fence at that time across said lots from east to west about 134 feet from the north line thereof, whereby the said north 134 feet of said lots was completely closed, etc.; that she has never abandoned possession; that said Gibbons, or G. W. Reed, is in possession of the residue of said five lots without her consent.

She further alleges that said Charles L., Joseph S., William H., Margaret A. and Laura A., being of lawful age, by deeds recorded on and before November 16, 1866, conveyed all their interest in said lands to said Joseph W. Wiltberger, whereby petitioner became vested with the legal and equitable title to said five lots in fee simple, but if not so vested, still she insists she became and is vested with title, because October 3, 1865, said Joseph W. Wiltberger filed his bill in the Superior Court of Chicago against said Embree, Tompkins and others, but not including the petitioner, setting up said mortgage and notes, and that for default in 1862 said Joseph had attempted to foreclose under the power of sale, but that

the same failed to be effectual, for the reason in said bill stated, that said Embree and those claiming under him had made no effort to pay said notes; that Embree was insolvent; that the whole of the principal sum was due by the terms of the mortgage, and over $41,000 interest, and said premises were worth not over $24,000, and praying that the attempted foreclosure under the power of sale be held null and void, and that Embree be decreed to pay what might be found due, or be barred from all equity of redemption ; that on June 18, 1866, a decree was entered in said cause, finding default in the payment of said notes, etc., and that said deed, under the power, was not according to said power, and decreeing that said sale be set aside and said mortgage continued in full force, and that upon defendants paying amount due in thirty days the complainant do satisfy said mortgage, but that in case of default they be barred from all equity of redemption, etc.

It is further alleged that neither Embree nor Tompkins, nor any other person, after the entry of said decree, ever paid any of said moneys, and that the mortgage was then, if not before, fully and finally foreclosed; that on June 3, 1869, Tompkins and wife quitclaimed to Daniel H. Carpenter said lots 2, 3, 25, 26 and 27, and the deed was properly recorded June 4, 1869, and on September 20, 1870, Carpenter conveyed the same to Gibbons, and the deed was properly recorded on the 23d September, 1870; and on September 20, 1870, Gibbons and wife conveyed lots 2 and 3 to James H. Rees, and the deed was properly recorded on the 5th of October, 1870. On the 22d of September, 1870, Rees and wife conveyed to the South Park Commissioners the north 134 feet of said lots 2 and 3, and the deed was properly recorded October 5, 1870, and on May 10, 1871, Rees and wife conveyed the residue of said lots 2 and 3 to Gibbons, and the deed was recorded May 11, 1871.

It is further alleged in the petition that Joseph G. Gibbons and the South Park Commissioners make claim to said premises;

that said decree remained in full force for a long time, and has never been reversed by any proceeding in which petitioner was a party, and she believes said foreclosure proceedings were effectual for that purpose, and that Embree was in default for a long time before said proceedings were commenced, and had not paid taxes nor any attention thereto, and said premises were abandoned by Embree and Tompkins and all persons claiming under them, who allowed the same to be dealt with by Wiltberger and petitioner as absolute owners without objection, and it was only after a long time and an extraordinary rise in value that Tompkins and others reasserted their stale claims; that at the time of conveyance by Joseph W. Wiltberger to Egbert Wiltberger, Tompkins was and ever since has been a resident of Chicago, in said county, and knew of said sale and conveyance and of other conveyances by Joseph W. Wiltberger, including the conveyance to petitioner, and acquiesced therein, and failed until June 3, 1869, to make any claim adverse to petitioner or to the title of any person claiming under Egbert, and until 1870 no part of said 120 acres was occupied adversely to those claiming under Joseph W. and Egbert W. Wiltberger, during all of which time petitioner paid all taxes on said five lots, and Tompkins paid no taxes nor any attention, whereby, if not otherwise, the equity of redemption was barred by acquiescence and laches; that Tompkins was personally served with process in said foreclosure suit, and his default entered June 11, 1866, and he permitted his rights to sleep a long time, and now has no just rights in said premises; Tompkins and those claiming under him have now lost all rights by abandonment and laches; that about April 25, 1868, Joseph W. Wiltberger and Martin Andrews filed a bill to further foreclose said Embree mortgage, whereon decree was entered October 26, 1868, finding default, and decreeing foreclosure in ten days unless the sum due should be paid, which decree was made absolute November 14, 1868, during which proceeding said complainants had no knowledge of any claim by Tompkins, and petitioner claims

that if she had not previously acquired title to said five lots, the title thereto inured to, and became vested in, her by virtue of said last decree; that by the great fire of October, 1871, all records of Cook county, including the record of said deeds and proceedings and deed from Joseph to petitioner, were destroyed, and only the deed to Gibbons recorded since said fire, and no other person than petitioner has any claim to said five lots, and if any other persons than defendants make any claim petitioner makes them parties by the name of "All whom it may concern," and she makes Tompkins and others parties. Since her deed from Joseph, petitioner has paid all taxes up to and including the year 1869. While the Andrews foreclosure suit was pending, Gibbons stated to petitioner that her interests ought to be protected, and petitioner, being ignorant of the nature of such proceeding, employed Gibbons as counsel (he being an attorney), and paid him $100, and shortly he represented that he had successfully protected her interests, and that her title was perfect, whereby she was lulled into security, and she believes that Gibbons and Carpenter were then scheming to deprive her of her land; that Gibbons was then fully advised of the nature of Tompkins' claim, and with intent to deceive her and make her rest satisfied, stated that her title was perfect, and in consequence she abstained from active measures for a long time, either to perfect her title or to recover back purchase money; that Gibbons acted as her counsel at the time she purchased said five lots, and as her counsel delivered to Wiltberger the purchase price of said lots and received the deed, and ought to be estopped to deny her title; that it was his duty to examine the title; that he never notified her of any defect; that said commissioners nor other person have paid any valuable consideration in good faith without notice of the rights of petitioner, and she charges them with notice thereof. Wherefore she prays that defendants may be summoned, and that her title may be established, and for other relief, etc.

Gibbons, in his answer, denies that the petitioner is the owner of the lots she claims in her petition, and says that lots 2, 26 and 27 are owned by the defendant Carrie C. Gibbons; that the north 134 feet of lots 2 and 3 are owned by the South Park Commissioners, and the residue of said lots, appearing of record in the respondent, is owned by other parties, for whom the respondent is trustee. He alleges that the deed to Egbert W. Wiltberger, dated June 10, 1862, and the deed executed by him back to his father, Joseph W. Wiltberger, dated September 4, 1864, are wholly ineffectual as a source of title or ground of relief for petitioner, because said deeds make no attempt to convey the interest or title of Jesse Embree, the mortgagor, but only of Joseph W. Wiltberger, the mortgagee, and that said Joseph and Egbert, agreeing that said deed of June 10, 1862, was merely colorable, without consideration, and wholly invalid, further agreed to abandon the same, and in pursuance thereof said deed of September 4, 1862, was made, and thereafter said Joseph claimed only as a mortgagee, and, in 1865 and 1868, filed bills of foreclosure of said mortgage, of which petitioner had notice, and whereby she is barred from any claim or relief founded upon said conveyance; that as to the alleged foreclosure by bill in equity, filed October 3, 1865, no decree was ever rendered under which petitioner can be entitled to relief; but said decree was merely conditional, and never made absolute, and so uncertain and defective on its face that it could not constitute a source of title, and said decree was afterwards reversed by the Supreme Court, and said suit thereafter dismissed; that as to the decree of foreclosure upon bill filed by Wiltberger and Andrews, April 25, 1868, demurrer has been sustained; denies abandonment, *laches* and delay, and claims due diligence, and charges petitioner with greater delay and neglect than respondent; protests that petitioner has not stated facts on which an estoppel can be alleged, and claims benefit of demurrer, and denies that petitioner purchased with advice of respondent, but says that he was not acquainted

with her, and had no business relations with her, at the time of her purchase; that his only business relation with her in reference to said lots as her attorney was in connection with said Wiltberger and Andrews foreclosure case; denies fraud, deceit and improper conduct in relation to petitioner; says that she refused to pay for services in said suit, and released him from further attention in the matter, etc.; that as to lot 2, the deed from Embree to Tompkins was made subject to contracts from Yerby to Hickok on payment of the purchase price; that after Carpenter purchased from Embree, and was in possession in pursuance of said contract, Carpenter conveyed lot 2 to Hickok, and afterwards Hickok conveyed to the respondent, who now holds as trustee for others, free from all parties claiming title under Embree or Wiltberger; that, as to petitioner's title, leaves her to make proof, and denies the validity of her deed from Wiltberger; denies that petitioner has any valid title to said lots, or either of them, and alleges that she claims under an attempted conveyance by a mortgagee, which is void in law, both as an attempt to convey an estate in the land and as an attempt to transfer any portion of the mortgage debt, and under such conveyance petitioner can have no remedy against said Embree, the mortgagor, or this respondent, but only against the mortgagee under the covenants in her deed from him; that the possession of said premises belongs to and is, in fact, in respondent.

The answer of Carrie Gibbons says she is the owner of lots 25, 26 and 27, in block 2, described in the petition, under deed from Joseph G. Gibbons, and she adopts, as her own, the answer of Joseph G. Gibbons.

The answer of the South Park Commissioners denies that petitioner was or is the owner of the legal or equitable title to said premises as alleged in the petition; denies that at the time her deed was made, in 1863, Joseph W. Wiltberger was seized of any legal or equitable interest in the premises, but if so, at the time respondent purchased and made payment of purchase money, it had no notice thereof; that respondent is

a body corporate under the laws of Illinois, authorized to take and hold lands, etc.; that on the 20th September, 1870, Joseph G. Gibbons owned said premises, and on that day conveyed to James H. Rees, who then owned and possessed the same in fee simple, adversely to any right of petitioner; that on September 22 and 23, 1870, said Rees and Gibbons, by separate deeds, for a valuable consideration, to-wit, $100,000, then and there paid by the respondent, did convey to the respondent the north 134 feet of said lots 2 and 3; that respondent then and there received said deeds and paid said grantors the sum of $31,500, and took possession of said lands, and still holds the same; that said Rees and Gibbons were seized of said lands in fee, but if not, yet, by the records of Cook county, they appeared to have a good and valid title in the law, in fee simple, by a connected chain of title, of record, from the United States and the State of Illinois, and petitioner's deeds are no part of such chain; but if petitioner's deeds are older than respondent's, in date, yet, in making its purchase and payments, defendants had no notice of such deeds, other than such as belongs to such chain; denies generally the allegations of petitioner, and requires proof; alleges that petitioner has been guilty of *laches* in asserting her claim; denies that she was in possession, or that respondent had notice of the pretended representations of Gibbons; again claims to be a purchaser for value without notice.

The cause was heard on written and oral proofs, and the court found from the same that the facts were substantially as alleged in the petition, which findings are recited in the decree; and the court thereupon decreed that the absolute title in fee simple, both at law and in equity, to said five lots be and the same is hereby vested and established in said Mary Hoag, her heirs and assigns forever, free from all right, title, interest, claim or demand of said defendants, or any of them, and that she is entitled to possession, and that J. G. Gibbons and the South Park Commissioners pay the costs of this suit.

To reverse this decree the present appeal is prosecuted.

Mr. C. C. BONNEY, and Mr. F. H. KALES, for the appellants:

The specific object of this suit was to have the court restore certain title papers and records that had been destroyed by fire, and to ascertain and declare that the legal title to the premises was vested in the petitioner at the time of such destruction.

The petitioner claims title under an attempted foreclosure of a mortgage by virtue of a power of sale. "It is admitted by all courts that these sales are liable to much abuse and ought to be most jealously watched." Upon the slightest proof of fraud or unfair conduct, or of a departure from the power, they will instantly be set aside. *Longworth* v. *Butler*, 3 Gilm. 32; *Bronson* v. *Kinzie*, 1 How. 321.

And a purchaser is chargeable with knowledge of all such facts as he might have ascertained by the exercise of ordinary diligence and understanding. *Rupert* v. *Mark*, 15 Ill. 542; *White* v. *Kibbe*, 42 id. 510.

The law presumes that a purchaser inspects all public records, through which title must be derived, before he receives a conveyance. This duty extends to the grantees of the purchaser. *Curtis* v. *Root*, 28 Ill. 376; *Morris* v. *Hogle*, 37. id. 155; *Southern Bank, etc.* v. *Humphreys*, 47 id. 233; *Scott v. Milliken*, 60 id. 112.

If the petitioner's claim was wholly barred by her *laches* at the time of the destruction of the records, that destruction would not revive her claim and entitle her to a decree. Her claim originated January 31, 1863, and the records were destroyed October 9, 1871. Between those dates she did nothing to establish her demand. That the neglect and delay of which she was guilty are fatal to her demand seems to be abundantly established by the decisions of this court. *Castner* v. *Walrod*, 83 Ill. 171; *Beach* v. *Sloan*, 57 id. 25; *Rogers* v. *Simons*, 55 id. 76; *Winchell* v. *Edwards*, 57 id. 45; *Carpenter* v. *Carpenter*, 70 id. 457; *Cox* v. *Montgomery*, 36 id. 396; 2 Story's Eq. Jur., sec. 1520.

The sale under the power was made before the debt was due. The $48,000 note was given upon a condition that the title of certain minor heirs should be procured, which was not done, and the debt not being due, the attempt to exercise the power of sale was abortive. The power of sale had not then arisen. Hill on Trustees, 720.

The deed from Joseph W. Wiltberger to Mary Hoag, January 31, 1863, was void as a conveyance of title. It conveyed no interest in the land, or in the debt, but was a nullity. It only purported to convey the interest of the mortgagee. But the mortgage interest, as distinct from the debt, has no determinate value and is not a fit subject of assignment. *Smith* v. *Smith*, 15 N. H. 65; *Bell* v. *Morse*, 6 id. 210; *Furbush* v. *Goodwin*, 5 Foster, 425; *Whittemore* v. *Gibbs*, 4 id. 484; *Jackson* v. *Bronson*, 19 Johns. 325; *Ellison* v. *Daniels*, 11 N. H. 282; *Aymar* v. *Bill*, 5 Johns. Ch. 195; *Jackson* v. *Willard*, 4 Johns. 41; *Wilson* v. *Troop*, 2 Cow. 195; *Cooper* v. *Newland*, 17 Abb. 342; *Merrott* v. *Bartholic*, 47 Barb. 253; *Pattison* v. *Hull*, 9 Cow. 747; *Jackson* v. *Blodgett*, 5 id. 202; 4 Kent Com. 194 (note a and b.)

Messrs. G. & W. GARNETT, for the appellee:

Commencing with the case of *Carroll* v. *Ballance*, 26 Ill. 9, we find the decision of this court to be that the legal title is in the mortgagee. Following that are the cases of *Jackson* v. *Warren*, 32 Ill. 341; *Nelson* v. *Pinegar*, 30 id. 480; *Harper* v. *Ely*, 70 id. 581.

If the deed made by Joseph to Egbert, under the power, did not pass the strict legal title, then when Egbert conveyed back to Joseph in September, 1862, the whole title legally and equitably vested in Joseph, and he conveyed to Mary Hoag January 31, 1863, before anything was done to disturb his rights or interests.

If the sale by the mortgagee was in trust for his own use and benefit, still the sale is not void, but only voidable in

equity within a reasonable time.  *Bush* v. *Sherman,* 80 Ill.
160; *Hamilton* v. *Lubukee,* 51 id. 420.

Counsel also argued at considerable length upon the facts
of the case.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the
Court:

The mortgage executed by Embree to Joseph W. Wilt-
berger contains the following:

"*Provided, always,* if the first party shall pay said sum at the
time and in the manner specified, then these presents shall
be void.  But it is further provided, that if default be made
in the payment of either of said notes, and in case either note
for $2400, numbered one in red ink, shall remain unpaid
thirty days, or either note for $2400 numbered two shall
remain unpaid ninety days, or if $12,000 of the note for
$48,000 is not paid in thirty days after January 1, 1868, then
the whole sum remaining unpaid shall immediately become
due, and this mortgage may be immediately foreclosed at the
option of the second party, or the second party, after publishing
notice thirty days, may sell at public auction all the right and
equity of redemption of Jesse Embree, and as attorney of
said first party, execute and deliver a good deed of conveyance
in fee simple, and out of the proceeds pay the notes, interest,
taxes, costs and charges,—which sale so made, either by and
under a decree of foreclosure or by notice and publication,
shall be a perpetual bar, both in law and equity, of all right
and equity of redemption."

The deed from Joseph W. Wiltberger to Egbert Wilt-
berger contains this language, after reciting the condition and
power of the mortgage:

"And whereas, default has been made in the payment of
$13,800, and interest since maturity, secured to be paid by
several notes, the last two of which matured January 1, 1862,
the others long prior thereto: Now, I, Joseph W. Wiltberger,
did on May 9, 1862, cause a notice to be published thirty days,

consecutively, that said premises would, on June 10, 1862, at 10 o'clock A. M., at the court house door in Chicago, be sold at public auction, for cash, by virtue of the power in said mortgage vested; and whereas, at the time and place aforesaid, in pursuance of said notice, said first party offered for sale, at public auction, said premises, and said second party bid $48,000 for said land, which was the highest and best bid made therefor:

"Now, therefore, in consideration of the premises and the sum of $48,000 in hand paid, I, as mortgagee as aforesaid, do hereby remise, release and quitclaim to said second party, his heirs and assigns forever, all the right, title and interest which I have acquired by virtue of said mortgage of, in and to all the certain tracts (describing the 120 acres), together with all appurtenances, and also all interest of said first party to the same. To have and to hold the same as fully and absolutely as said first party can by virtue of the power and authority in him, in and by said mortgage vested, convey the same unto said second party, his heirs and assigns forever." Acknowledged June 10, 1862, and recorded Sept. 16, 1862.

On the 4th of September, 1862, Egbert W. Wiltberger, by deed of that date, which was recorded September 17, 1862, reconveyed to Joseph Wiltberger, and Joseph W. Wiltberger, on the 31st of January, 1863, by deed of that date, which was recorded February 5, 1863, conveyed that part of said real estate which is described as lots Nos. 2, 3, 25, 26 and 27, in block 2 in Yerby's subdivision, to the appellee, Mary Hoag.

It is apparently conceded that appellee was a purchaser in good faith for full value paid for these lots,—at all events the proof establishes this to be the fact.

There is no proof tending to impeach the recitals in the deed in regard to the sale from Joseph W. Wiltberger to Egbert W. Wiltberger, but, upon the contrary, the abstract prepared by appellants shows that, on the hearing, evidence was introduced showing that Joseph W. Wiltberger, "because of default in payment of about $13,800 on said notes, adver-

tised said premises for sale, under the power in said mortgage, and at said sale said premises were struck off and conveyed by said Joseph W. Wiltberger to Egbert W. Wiltberger."

The objections taken to appellee's title are:

1st. The attempt of the mortgagee to exercise the power of sale contained in the mortgage was not sufficient to divest the title of the mortgagor, and invest title in the mortgagee.

2nd. But if the power of sale contained in the mortgage was properly exercised by the mortgagee at the sale on the 10th of June, 1862, then, thereafter, he had no further power in that regard, and that sale did not embrace the interests of Charles L. Wiltberger, Joseph S. Wiltberger and Laura Ann Wiltberger, who were then minors, and who respectively subsequently, on their becoming of lawful age, conveyed their several interests to him,—but that those conveyances, when made, inured to the benefit of the title of Jesse Embree.

3d. That the mortgage was never treated as foreclosed by the sale on the 10th of June, 1862.

4th. The sale was void, because the purchase by Egbert W. Wiltberger was not made in good faith, but was in reality for the mortgagee, Joseph W. Wiltberger.

5th. The deed from Joseph W. Wiltberger to appellee, Mary Hoag, conveyed neither an interest in the land nor an interest in the debt.

6th. As respects lot 2, waiving all other objections, it was held by a paramount title, based on contract between Yerby and Hickok.

These will be examined and passed upon in the order in which they are stated.

1st. The last note due, secured by the mortgage, is as follows:

"$48,000.00.                    *Chicago, November* 18, 1858.

"On the first (1st) day of January, A. D. 1868, I promise to pay to the order of Joseph W. Wiltberger forty-eight thousand dollars. Value received.

"This note is given subject to the ratification of the sale and conveyance of their part, being one-quarter of a part of section No. 15, in township 38 north, range 14 east of the third principal meridian, described in a deed bearing even date herewith, between Joseph W. Wiltberger and others to Jesse Embree, by the minor heirs of Joseph W. Wiltberger, named as follows: Charles Lewis, Joseph Samuel, and Laura Ann Wiltberger, and is to be paid when due, if said minors before that time shall have conveyed their interest so as to pass all their right, title and interest in and to said premises, in said deed described, to the said Jesse Embree, his heirs, executors, administrators or assigns, and is to be paid any time thereafter when said minors shall well and truly convey their interest in fee, as above described, to said Jesse Embree, his heirs, executors, administrators or assigns, or so that it will inure to his or their benefit.

JESSE EMBREE."

And the point attempted to be made is, that inasmuch as this note is expressly referred to in the mortgage, it is to be read as if inserted at large in the mortgage, and that the condition of the note is to be construed as a proviso in the power of sale—and that, therefore, until the mortgagee shall have procured the conveyances specified in this note, there can be no sale, and hence the sale on the 10th of June, 1862, being before such conveyances were made, was premature and a nullity.

This construction is not tenable. The condition of this note relates solely to the $48,000, which, by its terms, is promised to be paid on the first day of January, 1868. That period was after each of the parties named in the condition would be of lawful age, so that there was and could be no ambiguity as to the time of the maturity of the note. It was conditional, but payable January 1, 1868.

But the other eighteen notes are not conditional. Each is payable absolutely for $2400 on the day named on its face, and which day, as to several of them, is before the parties named in this condition would be of lawful age. And the

mortgage expressly provides that "if default shall be made in the payment of either note for $2400, numbered one, in red ink, for thirty days, or either other note for $2400, for ninety days," * * * then the whole sum unpaid should become due, etc., and said mortgage might be foreclosed, etc.

As to these notes, clearly default would be made in payment if payment should not be made within the designated number of days after the day named as the time when the notes are payable. But as to the $48,000 note, default could only occur after tender of deeds by the parties named, and the expiration of the designated period after the day named for the payment of the note, without payment.

The default declared was not on account of the $48,000 note, but on account of the $2400 notes, which were due and payable without reference to the condition annexed to the $48,000 note, and the sale, therefore, was not premature.

2d. The mortgage given by Embree to Joseph W. Wiltberger uses the language that the party of the first part (Embree) "has granted, bargained, sold and conveyed, and by these presents doth grant, bargain, sell and convey unto the party of the second part" (Wiltberger) "and his heirs and assigns forever." Then follows a description of the same property embraced in the deed of Wiltberger and others to him. The mortgage was given to secure the payment of the purchase money, and it seems quite clear from all the circumstances that it was designed every interest which Embree acquired by his deed, to the benefit of which any subsequently acquired title could possibly inure, should pass by that mortgage and any sale that might be made pursuant to its terms. And conceding it to be true that the deeds subsequently made to Wiltberger inured to the benefit of Embree's title, it must be observed this has no reference to Embree's person, but only to the title which Wiltberger undertook to convey to Embree, and which Embree mortgaged back to Wiltberger; and hence, if Embree's title was sold at the sale on the 10th of June, 1862, it inured to the benefit of the title sold and pur-

chased at that sale. And so we have ruled in former cases. *De Wolf et al.* v. *Haydn,* 24 Ill. 525; *Bybee* v. *Hageman,* 66 id. 519; *Taylor* v. *Kearn,* 68 id. 339.

In the last named case a person having only a contract of purchase of land, mortgaged the same, using as is here used, the words "grant, bargain and sell," and it was held that afterwards, upon payment and a deed being made to him, the title so acquired, under the statute, inured to the mortgagee, and that, in equity, such title will inure to an assignee of his rights under the contract, without any covenants in the assignment.

3d. We do not regard it of controlling importance that Wiltberger, after his sale and conveyance to appellee, treated the mortgage as not foreclosed by the sale of June 10, 1862. There is no proof that appellee treated the mortgage thus, nor that she had reason to believe or did believe at the time of her purchase, that the mortgage was not foreclosed by the sale of June 10, 1862. No subsequent act of Wiltberger, without her consent and approbation, could affect her rights. She is entitled to stand by the record as it was when she purchased.

4th. Conceding it to be true that the purchase by Egbert W. Wiltberger was not in good faith for himself, but was, in fact, for Joseph W. Wiltberger, as was said in *Farrar* v. *Payne et al.* 73 Ill. 86, that fact would not render the sale void. It would only be voidable, subject to be set aside while the estate was in Wiltberger's hands, but not after its transfer to a *bona fide* purchaser. See, also, *McHany* v. *Schenk,* 88 Ill. 358.

No effort was made here by Embree or those claiming under him to set aside this sale or repudiate it for a period of more than five years, during which time appellee had become a purchaser in good faith, relying on the validity of the sale, and was suffered from year to year to expend money in payment of taxes, etc. Embree, it will be borne in mind, conveyed to Tompkins on August 19, 1859, and Tompkins

then expressly assumed the payment of the amount of the mortgage from Embree to Wiltberger. Tompkins thenceforward continuously resided in the city of Chicago, at no very remote distance from this property, yet made no movement towards setting aside or repudiating the sale or releasing from the mortgage. This *laches* precludes all inquiry into mere irregularities, which would but render the sale voidable, if availed of by the proper parties in apt time and before the intervention of the rights of third parties. *Farrar* v. *Payne, supra; Bush* v. *Sherman,* 80 Ill. 173; *Hamilton* v. *Lubukee,* 51 id. 420; *McHany* v. *Schenk, supra; Munn et al.* v. *Burgess et al.* 70 id. 604.

5th. This same mortgage was before us in *Mulvey* v. *Gibbons et al.* 87 Ill. 367. Among the questions there raised was the sufficiency of the sale of the 10th of June, 1862, to pass an equitable title, conceding that the deed from Joseph W. Wiltberger to Egbert W. Wiltberger, by not strictly conforming to the power, did not convey a fee simple title, valid in a court of law, on the authority of *Speer* v. *Hadduck,* 31 Ill. 439, and the court said: "Another foreclosure claimed is under the power of sale in the mortgage. The objections taken to this foreclosure are, that the property was bid in at the sale indirectly for the mortgagee, and that the deed executed pursuant to the sale was made in the name of the mortgagee, and not in the name of Embree, the mortgagor, the mortgage providing that upon the sale the mortgagee might, as the attorney of the mortgagor, for that purpose by the mortgage duly authorized and appointed, execute and deliver to the purchaser a good and sufficient deed, etc. The first objection would render the sale voidable only at the option of the mortgagor, to be determined in apt time. But neither he nor his grantees have ever taken any steps to set aside the sale. * * * *

"The mortgage gives the power, in default of payment, to sell the land and all right of redemption at public auction, and declares that the sale shall be a perpetual bar to the right

and equity of redemption. The sale itself, duly made, would seem to be the principal thing, and the substantial foreclosure of the right to redeem; and however, in case of such a form of mortgage, the deed made in the name of the mortgagee, and not in the name and as the attorney of the mortgagor, may be regarded as not conveying a good title in fee simple to the purchaser, as seems to have been held in *Speer* v. *Hadduck,* 31 Ill. 439, in an action of ejectment, we must regard such a proceeding for foreclosure as not to be disregarded in its bearings upon the equities in this case."

In *Watson et al.* v. *Sherman et al.* 84 Ill. 263, there was a power to an attorney to sell and convey, which the attorney proceeded to execute by selling and conveying, but the power was not under seal. It was held the power to sell was good without a seal, but that the conveyance was invalid because of the want of a seal to the power. And it was also held, that notwithstanding the defective deed, the purchaser at the sale obtained an equitable title, which would be conclusive in all proceedings in a court of equity.

The case, in all essential points, is analogous to the present. As has been shown in the first part of this opinion, there is no proof tending to impeach the recitals in the deed from Joseph W. to Egbert W. Wiltberger; and the tendency of all the proof is, to show that the sale was after proper notice published, and in all respects strictly pursuant to the terms of the power. Necessarily, therefore, the sale passed to Egbert W. Wiltberger the equitable right to have a deed to the property, subject, however, to the right of Embree and those claiming under him, (which was never exercised,) to have the sale set aside in apt time, because it was secretly intended that the purchase was for the benefit of Joseph W. Wiltberger.

This is not a proceeding at law to test the strength of strictly legal titles, but a proceeding in equity to establish a title, and the inquiry relates to the equities, only, of the parties. *Mulvey* v. *Gibbons et al. supra.*

At most, appellee is chargeable only with notice, when she

purchased, that this property had been regularly and lawfully sold under the power, but that the deed was defective in form and insufficient as an instrument of conveyance. The deed from Egbert W. to Joseph W. Wiltberger was regular in form and assumed to convey the entire estate, and the same is to be said of the deed from Joseph W. Wiltberger to her. All these deeds, including the defective deed from Joseph W. Wiltberger to Egbert Wiltberger, which correctly recited a valid sale of the property, were put on record in apt time, so as to affect those now claiming as against appellee, with constructive notice; and this was sufficient notice to them that there had been a valid sale under the power in the mortgage. *Farrar* v. *Payne et al. supra; Heaton* v. *Prather et al.* 84 Ill. 330.

It is enough, for the present, that appellee is entitled to a deed.

6th. The claim to lot 2 is derived thus: It appears that prior to the conveyance by Wiltberger and others to Embree, George W. Yerby had contracted with Wiltberger to purchase the property, which was finally conveyed to Embree. Subsequently, Embree took Yerby's place under this contract, and, pursuant thereto, the deed was made to him, instead of to Yerby. Before the conveyance to Embree, and after the making of the Yerby contract, Yerby made the subdivision of the property into lots, which has been before repeatedly alluded to, and on the 25th of August, 1857, entered into a written contract with one W. O. Hickok, whereby he sold and agreed to convey to him said lot 2 on payment by Hickok of $790, within ten years from date, and interest, payable annually in advance, on that amount, at the rate of eight per cent per annum, and the time of payment of said principal, and each installment of interest, was made of the essence of the contract. This contract was recorded January 9, 1861. November 18, 1858, Yerby assigned this contract to Embree; September, 9, 1859, Embree assigned it to Tompkins; and November 7, 1859, Tompkins assigned it to Gibbons; June

3, 1869, Tompkins made a deed to Daniel H. Carpenter in fee for said lot and other lots; July 6, 1870, Carpenter conveyed said lot in fee to Hickok; October 5, 1870, Hickok reconveyed said lot to Carpenter; September 20, 1870, Carpenter conveyed said lot, with other lots, to Gibbons. It appeared that $63.20 was paid on said contract August 25, 1857, and that no other payment was ever indorsed thereon.

On the other hand, appellee's title is thus deraigned: Jesse Embree conveyed this lot, with the other lots in controversy, to Tompkins, August 19, 1859, Tompkins assuming and agreeing to pay off the mortgage to Wiltberger. Tompkins conveyed the lot, together with others, to Gibbons, January 7, 1861, subject to the mortgage and contract of sale. September 9, 1862, Joseph W. Wiltberger conveyed said lot 2, and other lots, to Gibbons. On the 6th of December, 1862, Gibbons reconveyed said lot 2, and other lots, to Joseph W. Wiltberger, and warranted the title against his own act and all persons claiming under him; and on January 31, 1863, Joseph W. Wiltberger sold that lot, and the other lots in controversy herein, to appellee, for their full value then paid, and conveyed the same to her by warranty deed of that date.

It is manifest Tompkins' conveyance to Gibbons, January 7, 1861, left no title in him to the lot, so that his attempt to convey the same lot again to Daniel Carpenter, June 3, 1869, was a mere nullity; and the conveyance by Carpenter to Hickok, July 6, 1870, and by Hickok back to Carpenter, October 5, 1870, and by Carpenter to Gibbons, September 20, 1870, resting as they do for their validity upon that conveyance, were also nullities. The deed of Tompkins to Gibbons, the deed of Gibbons to Wiltberger and the deed of Wiltberger to appellee, were all recorded shortly after they were executed, and long before the conveyance by Tompkins to Carpenter; and hence, Carpenter, Hickok and Gibbons all had notice, by the record, when they received their respective deeds, that the title had been legally conveyed to and was then held by appellee.

But it is claimed, at all events, the court should have decreed a payment of the amount due on the Hickok contract; but there is no claim in the pleadings that would justify such a decree. No one therein claims the payment of money on account of that contract. Besides, by the terms of that contract, time is made of the essence of it. No payment has ever been made on account of it, except the payment of $63.20 made August 25, 1857; nor has any tender therein since been made.

In the face of such inexcusable and long delay, no court of equity would be authorized to decree a specific performance of such a contract or a rescission of it and a return of the money paid thereon. So far as appears, the fault is all on Hickok and those claiming under him. It is entirely too stale for any present use.

The claim that appellee has been guilty of *laches* which should bar her right, is destitute of merit. Mere delay alone, short of the period fixed as a bar by the Statute of Limitations, will not preclude the assertion of an equitable right. It is only when by delay, and neglect to assert a right, the adverse party is lulled into doing that which he would not have done, or into omitting to do that which he would have done in reference to the property, had the right been promptly asserted, that the defence of *laches* can be considered. There is no pretence of any prejudice resulting to appellants by reason of the non-action of appellee, in any respect.

In conclusion, there is a defence as against Gibbons, who claims all the property in controversy except the north 134 feet of lots 2 and 3, which would be entirely effectual, which we have not yet noticed.

"Among other facts found by the court below, and which we think fully authorized by the evidence, is the following:

And the court finding that at the time of said purchase of said five lots by Mary Hoag, said J. G. Gibbons acted as her counsel in said transaction, he then being an attorney-at-law; that he, as such counsel, received from her said $900 purchase

money, and paid the same over to J. W. Wiltberger, and received from him said deed and filed the same for record, and received the same from the recorder's office, and delivered the same, together with an abstract of the title to said five lots, to said Hoag, but wholly failed and neglected to inform or notify her of any defect in her said title; and that she was led to believe, and did believe, from the conduct of said Gibbons on that occasion, that she acquired a perfect title by said deed; that after such purchase, said Gibbons, as her agent, paid taxes on said lots for several years; that in 1868, pending the Andrews foreclosure suit, said Gibbons stated to said Hoag, then a resident of Cincinnati, that her title was involved, and that her interests ought to be represented, and that she, believing said statements, retained said Gibbons to represent her, and paid him $100; and said Gibbons agreed with her that he was to be paid $100 more when her title to said five lots was perfected; that Gibbons proceeded to Chicago and examined the papers and files in said suit, and shortly returned and represented to her that her title to said lots was perfected by the decree of strict foreclosure rendered in said suit."

If the defence which he now seeks to interpose had any existence, it was his duty to notify his client fully and unreservedly. If the proceedings which he claimed perfected appellee's title did not, in fact, do so, it was his duty to so notify her.

It is not to be tolerated that an attorney shall advise or encourage a client in investing in a bad title, and himself, afterwards, buy up the better title and assert it as against his former client. Such a practice would open a door to endless wrongs and villainies, and bring great and just reproach upon the profession.

Story says, in his work on Equity Jurisprudence, sec. 219: "If an attorney employed by the party should designedly conceal from his client a material fact or principle of law, by which he should gain an interest not intended by the client,

it will be held a positive fraud, and he will be treated as a mere trustee for the benefit of his client and his representatives; and in a case of this sort it will not be permitted to the attorney to set up his ignorance of law or his negligence as a defence or an excuse. It has been justly remarked that it would be too dangerous to the interests of mankind to allow those who are bound to advise, and who ought to be able to give good and sound advice, to take advantage of their own professional ignorance, to the prejudice of others. Attorneys must, from the nature of the relation, be bound to give all the information which they ought to give, and not be permitted to plead ignorance of what they ought to know."

The park commissioners are purchasers having constructive notice of appellee's rights, and their claim, consequently, must yield before her's.

The decree below is affirmed.

<i>Decree affirmed.</i>